Complaint Sets Out the Defendant's Refusal to Negotiate with or Enter into Corporate Sub-Leases with Guarantee Agreements and Incentive Payments, is Disparate Treatment based on the race of ICP's clients. The defendants rent with guarantor agreements, they rent with incentive payments, Lincoln at least rents to corporate sub-leases, and they rent to tenants they might not otherwise rent to. This includes students being subsidized by their parents, tenants with irregular incomes, first-time renters with no rental history, and renters with low credit scores. The complaint alleges that these non-voucher tenants who get the benefit of these agreements are predominantly white compared to the voucher population. This disparate treatment and refusing to rent with these same practices is set out in the ICP requested that defendants enter into these, negotiate with these sub-lease agreements. They had clients who met the landlord's application criteria. The rents could be paid at the places where the request was made with specific units available. No response was given to the request and the units remained available and advertised as available for non-voucher tenants. There was supporting evidence in terms of the race of the non-voucher tenants. This refusal to lease on the basis of association with blacks is a recognized disparate treatment claim. I mean, you're alleging that, but what are you, their position is that they didn't rent to any Section 8 vouchers. I mean, I think you might have been able to support your case if, in other words, they're saying this is not disparate treatment, this is pure disparate impact because after all, the law gives them the right not to participate in this program. There's no law that gives them the right to not participate in this program. Well, it's an optional program and therefore, isn't it? Nobody is, no landlord is required to participate in the voucher program. And no city is required to pass a zoning ordinance to allow affordable housing by any other statute. All these actions... What's your authority that it's mandated that they must accept a Section 8 voucher? What is the authority that it is mandated, that it is an affirmative obligation on the part of the property owner or the management company? That's not our argument, Your Honor. Our argument is that... Well, maybe I misunderstood your answer to Judge Jones's question. No, I mean, it's that decision whether to rent to a specific tenant is a voluntary decision, just like lots of decisions are voluntary. That doesn't mean they're exempt from the Fair Housing Act. So it's a disparate impact argument. I think her question was, and she can certainly correct me, but I think I had the same question. Why is it a treatment, why are you making a treatment argument instead of the impact argument? The treatment argument is because while they do enter into these sublease agreements, into these guarantor agreements, into these incentive payment agreements on behalf of when asked to do so for a group that is, in fact, predominantly black vouchers, they refuse to do so. But there are a lot of different regulations involved in the Section 8 voucher program. And they would not have applied in the sublease agreement that was offered to these defendants. None of them would have. None of them would have. Yes. On the disparate treatment claim, our case in Petrello, I mean, we're talking about making out a prima facie case, right? Yes. Alleging a prima facie case. In Petrello, we allege the four requirements to make it, make out a treatment claim. Plaintiff is a member of a racial minority, but the second one is the plaintiff applied for and was qualified to rent or purchase the unit involved. So if the landlord has a uniform policy of not accepting voucher, people holding vouchers, under their rules, they're not, the applicant is not qualified to rent that unit. The applicant in this case, Your Honor, is the inclusive community. I'm talking about disparate treatment. Against all of them. So how do they meet that requirement that they were qualified to rent the unit? On the second disparate treatment case, which is against Lincoln, saying that they refused to rent to voucher tenants, we say that they meet all the criteria other than the fact that they're on vouchers. And it is that distinction is what makes it disparate treatment. On the first disparate treatment case. I mean, that makes it a disparate impact case, but not a treatment case. If in fact there are reasons, it can be both. Under all the authority, Judge, you can challenge the same practice or policy under disparate impact and under disparate treatment. So you think the requirements for stating a claim for disparate impact and disparate treatment are the same? No, I think they're different. What is the additional requirement to state a disparate treatment claim? The disparate treatment claim is that you're talking about a decision to implement a policy or practice or a decision whether to rent to someone and that that decision is based on a motive that takes into account race. And that that is the major difference between them. It can both can apply. For example, best example, Village of Arlington Heights, Supreme Court case, United States Supreme Court hears a case against a zoning ordinance and they decide there's no disparate treatment in the zoning and they remand it. There's no intentional discrimination. Then they remand it to the circuit and the circuit finds that there is disparate impact and strikes the ordinance down under the disparate impact rule. Well, you pled both of them and you have a problem. You have to prove robust. You have to allege robust causation on your disparate impact. But it seems to me I could have, it would be much easier to have demonstrated your disparate treatment claim if you had said to Lincoln, and here are some Section 8 voucher holders who are white. Are you going to rent to them? And if Lincoln had said, yes, we will consider it. And then you have the majority of your Section 8 holders and you bring one of one or two of them who are minorities to Lincoln and they say, no, that to me is disparate treatment, different treatment of similarly situated individuals. But Lincoln says, we treat all Section 8 voucher applicants alike, irrespective of their race. That's right. And so, for example, Why is that disparate treatment? Because it is, in fact, keeping a predominantly black group out of white areas. It is disadvantaging a predominantly black group. There is more ways to discriminate on the basis. Well, give me a case that says that if just because that you have a generic standard and a quote, predominantly black group, but no proof whatsoever of intentional conduct, a facially neutral policy, that that's disparate treatment. Well, one, this Village of Arlington Heights is a good example. It basically talks about, if you allege discrimination. But this is not Village of Arlington Heights. No, yes. Because that's a law that was basically saying that no people, we don't want people of a certain kind being in our area at all. And this is one apartment house or a series of apartment houses in a heavily populated urban area. And you're trying to use the fact that they have a facially non-discriminatory policy, which is allowed by the law, and they do not rent to Section 8 voucher holders. But they do rent to other corporate sublease agreements. But there's nobody, nobody would hold those who are similarly situated. I mean, in Title VII, we have rules on who's similarly situated. And a corporate, you know, person who's come to work somewhere for six months is not similarly situated. You know, getting paid a certain amount of money, buy his company, and so on, is just not similarly situated. They also enter into... They may be black or Hispanic or Asian, for all I know, in fact. They also enter into guarantor agreements for non-voucher tenants. In fact, they also... Between doing business with the government, you keep making the analogy of a zoning ordinance. Couldn't you also make the analogy, let's say, a grocery store that doesn't want to accept SNAP benefits? And I don't know what the demographics are on SNAP benefits in that area or any other area, but couldn't you make the same argument? Wouldn't it be a poor argument to say that if I don't take SNAP benefits because I don't want to do business with the government, but I will take a credit card or I will take a debit card, or, of course, I'll take cash? You keep analogizing other sources of support. I think you mentioned even, like, will parents pay rent for students? That's a far cry from accepting a government voucher, don't you think? The disparate treatment case is based on that it's ICP who enters into the lease. It's ICP who pays for the unit. It's ICP who provides the choices of tenants for the landlord to pick. It's ICP who contracts with the housing authority. The landlord does not contract with the housing authority. Do they do that on behalf of Hispanic... They'll do it whoever comes in. They go to briefings every week to all the voucher tenants, and they offer their services to all the voucher tenants. I just think that still brings us back to an impact claim, and I know your time is running short, but that doesn't seem like a treatment claim. It seems like more of an impact claim. Well, it would be like I don't want to take government SNAP, and somebody says, well, my mother will pay cash. And they would say, no, we won't take your mother's cash either because you are a SNAP client. Let me follow up on Judge Engelhardt's question. If you recover under disparate impact, does it matter that you don't recover under disparate treatment? Is there a difference in the damages or anything? Well, we're not seeking damages. We're seeking injunctive relief. But we think we get there under either disparate treatment or disparate impact. We get there either way. Why don't you talk about disparate impact then? I'll be happy to talk about disparate impact. We provide the same applicant pool data that is used in every disparate impact case. We show that the population likely to use the units is disproportionately black compared to non-voucher tenants, which is disproportionately white. We show that ICP has a state. I'm saying showing under the federal rule answer or complaint provision that ICP has clients who are, in fact, eligible under the application criteria. We support that by showing that Lincoln does rent to voucher clients in minority areas, presumably under the same eligibility criteria, and that also they can do so without having to sacrifice good business reasons. We show that the voucher population and the eligible voucher population are disproportionately black. We show that ICP has a set of clients who have a demand that is unmet for units in these areas. That's applicant pool. The robust causation comes in because the only reason they're not in the defendant's properties is because of their policy. They say explicitly, we will not rent to vouchers. We will not accept voucher clients. And we will not even, it's not disparate impact, but we won't even rent to ICP because you're going to let voucher clients on our premises. I mean, if someone were actually going to do this, did ICP provide financials that would back up the claim that you were going to guarantee the shortfall between the voucher payment and the actual rent? We plead that one landlord has. Pardon me? We plead that one landlord has accepted this. It's in the complaint. Well, I don't care if one landlord accepted it. Under standard business, I'd want to see what, you know, what have you got besides your good word to back up this guarantee. And in a negotiation, that would be a very good thing for a landlord to say. ICP, show us that you're good for your word. But we didn't get to negotiation. Who funds ICP? ICP is funded directly out of the settlement in the Walker case. There was a housing fund that the city put up that, in fact, is in a housing trust fund that comes, this is not the record. Right. Okay. That comes out of, that is administered as a trust fund. And so the negotiation on that, what is your credit record, let us run your credit record, is a perfectly good subject to negotiate about. We just never got there. And we got no response. Well, suppose this were, and I'm sorry, you have used up all your time, but I will give you a couple more minutes. Suppose this were a disparate impact claim, as you have alleged, then how do you allege robust causation as the Supreme Court required it? The robust causation, where claim is there, is that their policy is no voucher tenants. And the result is no voucher tenants. We don't have, there's no case that says- It has to cause impact, I believe means that it has to cause more, less minority habitation of housing in a particular area. Isn't that what disparate impact is? And that's what we allege, Your Honor, throughout the complaint, that the vouchers, the voucher eligible pool, and the voucher applicants are predominantly black. But how many landlords are there in the census tracts and area, and what was the other thing that you're talking about? I mean, if you, are you going to go landlord by landlord? And in other words, even if Lincoln accepted your program, what kind of impact amelioration would that have on the statistical information that you give about minority housing? And what we put in the brief is that it would be three to five voucher units per apartment complex, however many apartment complex it would take. What it would mean is that those specific voucher clients would be in a better census tract and location for themselves and their families. Maybe in any apartment complex, there would only be three to five. In any of these cases, the impact of any of the disparate impact cases never changes the racial composition of a metropolitan area, of a city, a village. It never changes that. You don't have to prove that. You're alleging census tract. Pardon? Why are you alleging at the level of census tract? Because census tract is what people, is what gets used as a basis for population analysis at or around the neighborhood level. You can do it lower. You can do it in block group. You can do it higher, you know, I mean, but that's, generally speaking, where does that... Then basically, any landlord would be vulnerable to a disparate impact claim if the landlord will not accept housing vouchers and there is less than the statistical percentage of minorities in a particular census tract. No, that wouldn't be roadblock causation, Your Honor, because you have to, let's say, for example, that landlord rents can't be paid under the voucher program. And that landlord doesn't have to take voucher tenants, no matter what the race of it is. I mean, the roadblock causation requirement is designed to keep that from happening, just because there's a racial imbalance and the landlord hasn't done anything. Isn't this exactly the same argument transferred to Section 8 that you made in regard to the tax policies of the state in the case that went to the Supreme Court? I mean, basically, you said, I can show differential statistics and that means disparate impact. No, Your Honor, we had findings of disparate perpetuation of racial segregation in that case. What you have here is a policy that you didn't have in the other case. We lost on that the discretion was not a policy for disparate impact purposes in that case, and that's a big difference. Here, we have a policy and that we also are saying is a decision. I'm way over time. You are. You have time for rebuttal. Okay, Mr. Baruch. Thank you, and may it please the Court. It seems to me the disparate treatment claim is being described a little differently today than it was put before the district court. There was discussion, allegation, in the complaint about the corporate models, but there was no discussion about the racial composition of the participants in those programs. As Judge Jones has noted in all areas of the law, and it's not just Title VII, we look at this in the equal protection context. We look at it in the selective prosecution context. The hallmark of disparate treatment is some other similarly situated person or entity is being treated differently, and here, there was no allegation and still really is no plausible argument of any similarly situated entity. I think as Judge Jones points out, Coca-Cola is not similarly situated to ICP. A college student having a guarantee from a parent is not similarly situated. So in our view, the district court got it exactly right. This was a disparate impact claim pleaded as a disparate treatment claim. Well, they do allege that at least this property manager does accept vouchers, Section 8 vouchers, in the low-income housing, which is different than what they do in the white community. So, sort of. And let me clarify that, because it gets tossed around, and I think all of the appellees get put into one jumble, and Your Honor, as you've pointed out, Lincoln solely is a property manager. I mean, the acceptance of the vouchers is up to the property owners, not up to Lincoln as the manager. It does manage some complexes where vouchers are accepted because they are required to be accepted by Federal law. When a complex accepts certain housing tax credits as a condition of receiving those credits, it must accept vouchers. But they build a complex under that assumption, too. Correct. They do that. Correct. Yes. So that is true. But ICP... Does he have his own separate policy on this, or is it always dictated by the property owner that hires Lincoln to handle leasing? To my understanding, that's always a property owner decision. Okay. Obviously, Lincoln brings a wealth of expertise in that area, and I'm sure there's consultation, but ultimately that decision is with the property owner. But they don't make a decision on whether or not to accept, or a recommendation on whether or not to accept its property owner? I suspect, and I will candidly tell you, I don't know the answer to that question. I'm sure Lincoln has consulted in the process. The decision always is with the property owner. And again, that's a very different situation. And ICP concedes that in its complaint. When it alleges that acceptance, it also refers to the fact that it's required by Federal law at those properties. So in our view, the district court got it exactly right. This really was a disparate impact claim, particularly given the repeated allegation of this blanket policy. But they do allege that there's intentional discrimination. I mean, I don't know how much you have to allege to make out a prima facie case. Your Honor, we would disagree that they have alleged that. We would — I think the way I would put it is that they've stated that as a formulaic recitation as an element of the claim. But it's very interesting. If you look at the complaint, the two pages of the complaint where the disparate treatment claim actually is pleaded, it's really just recitation of elements. There's no allegation of intentional discrimination in there. So in our view, if they've alleged it, they've not plausibly alleged it under Iqbal and Twombly. The other problem, and I don't want to spend too much time on disparate treatment, but the other problem is really they've got sort of the same problem the detainees had in Iqbal. You know, it's not enough just to be consistent with an entitlement to relief. And if the Court will recall, in Iqbal you had this allegation that the detention policy was based on ethnicity and religion factors. And the Supreme Court ultimately said, we can't tell. It could well be that this policy exists because of those things, or it could well be that this policy exists in spite of those things. Both of those would be consistent. And that, as the Supreme Court put it, that allegation as a result of that situation isn't enough to nudge the ball past the plausibility line. And ICP really has the same problem in this case. It alleges the blanket policy. It concedes that landlords have issues under, you know, a variety of issues under Section 8. And so there's nothing to suggest whether this policy is because of race or in spite of race. It's exactly the problem that exists. Has there been any change? And you're here for Lincoln, I believe, representing Lincoln. But has there been any change in terms of the defendants, any of the defendants' position where they were accepting and then made a decision for whatever reason to discontinue? And does that even make a difference? To my knowledge, the answer to your question, to my knowledge, is no, there has not been such a change. And it might. I think the Grouch decision is a case where that's a little bit different, where there might be circumstances where you participate and then withdraw. I think that's a very, very different situation than what we have here. And perhaps that's a good place to pivot and talk for a minute about disparate impact. Certainly, I want to start with the robust causation requirement, because as we understand what the Supreme Court said, ICP just does not come close to meeting that causation standard. Justice Kennedy was very clear in saying that when your disparate impact claim is based on statistical disparity, the plaintiff must allege the defendant's causation of that disparity. And I thought that was the reason that they were going into census tracts and block figures and all that, that they were saying that the impact, the disparity is in a larger area than just the single apartment house. That is my understanding of the disparity you're alleging. I infer that he is saying, well, if you even get three to five tenants in one project, in one apartment building, you're never going to affect the overall census tract figures. In which case, why even bother to cite census tract figures? And there's some conflation, I think, of two separate arguments there. Because you have, at least under the HUD regulations, it's very unclear as to whether there is such a claim as perpetuation of segregation. But under the HUD regulations, that's a different species of claim. And I think sometimes in the briefing, the two get blurred. Well, I mean, don't you agree that the regulation in 24 CFR is the governing standard for making out an impact claim? It is administratively. Now, whether it is legally, it's interesting to us that the ICP, that the Supreme Court never mentions that claim in ICP. But I don't think — and here's the bottom-line answer. But let me point this out to you. But yes, is the answer to your question. The inclusion case came up from this court. Yes, sir. And if you remember, the regulation had just been adopted. And so we said, well, the regulation is going to control the claim. And so we sent it back to the district court. And then it went up from there to the Supreme Court. And they affirmed us. So, I mean, isn't that pretty solid authority, that the regulation sets up the elements of the claim and what you can recover? I would — I think, in our view, it simply wasn't a question the Supreme Court ended up considering, that that might be a second question. But let me just say, in our view, that that claim is not implicated on this record. That claim suffers from exactly the same defect. Either way, under disparate impact, they've got the same problem, which is the causation. Huntington Branch is a great example. That's one of the lead, early perpetuation of segregation cases. And the court in that case was very careful. The two times it refers to the liability there, it says meaningful perpetuation of segregation. And later it says substantial perpetuation of segregation. Let me just read you this sentence out of the rig. It says — Yes. — to establish a discriminatory effect case. That's subsection A. A practice has discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces or perpetuates segregated housing patterns because of race and other reasons. So don't you read that as saying that what you have to show is that the policy results in a disparate impact on the group of persons who are involved here, the minorities who are trying to rent with a voucher? Well, yes. But I also read ICP unequivocally to say that you must show causation to the housing community disparity you are relying on for the claim. I mean, that — and that goes all the way back to Ward's Cove, Your Honor. I mean, remember — and Ward's Cove is at the heart of the concurrence, Judge Jones wrote in ICP, and then Justice Kennedy cites it as well. And Ward's Cove is a case where we're talking about the stratification in the workforce. And if you'll recall in that case, Justice White said if there are other reasons — for example, if there's simply a shortage of applicants, if just nobody applies, then the And here we sort of see the same defect. Remember, very interesting, ICP never alleges an applicant base in this case. The problem — I think that's the problem that I see in what the difference with the ICP case is, the ICP case was challenging the state policy of offering certain tax credits to low-income housing. And therefore, based on the statistics, did that have a disparate impact? And the Supreme Court only holds — and of course, our court had affirmed Judge Fitzwater, who had found liability, but then when it went up to the Supreme Court, our court vacated on the liability finding, or at least the damages finding. It goes up to the Supreme Court, and they say, theoretically, you can have a disparate impact claim. But what are you impacting, is the question. And what they allege, I thought, is that they are impacting adversely the housing situation on a census-track basis. And yet here, they're saying that a disparate impact can apply to one apartment house. And that's where I think you have to get into fatal collision with disparate treatment. I thought the main problem the Supreme Court had was — I mean, when it came back, there was no policy established. There could have been any number of reasons for the way the government ran their tax program, and they couldn't establish a firm policy. Here, we've got a policy. I mean, you advertised your policy. We have an alleged policy in this case, sir. But even if it's a policy, all it is is saying, we do not choose to accept this program. So if that's a — if our policy is consistent with what the law provides, I don't see how you can say it has a disparate — a violative disparate impact. And that's a separate concern for us, is that — a couple of separate concerns, actually, in addition to the robust causation issue. One is that very point, that in our view, this would effectively, by judicial fiat, make Section 8 participation mandatory for every property owner in a non-white area. That's what Knapp and Salute — we filed a supplemental authorities letter in the Second and Sixth — Seventh Circuits — have held, that that would violate congressional intent to make participation voluntary. I thought that's what a discriminatory impact case was. You showed that — that the effect of your application of that policy causes a discriminatory effect on a minority. I mean, isn't that what a discriminatory effect claim is? In general, I think that's a true statement. And if you've got — But — If 80-plus percent of your voucher holders are black, and you don't accept any holders of vouchers, why doesn't that create a disparate impact on the black customers of the plaintiff? Well, I think, for starters — I mean, a number of reasons. I mean, it's clear you can't — it's clear you can't refuse to rent to an individual on the basis of race. But you can refuse, can you not, to rent to an individual who can't afford to pay? Correct. And again, the flaw — all of this, in our view, is conceptual or theoretical because, as alleged in this case, we don't have an applicant population. ICP — again, I want to make this point as clearly as I can — ICP did not allege the existence of an actual applicant population here. All ICP said — and remember, we're dealing with a number of units here, some of them substantial in size — all ICP said was — very carefully in its complaint — we have some African-American clients who want to move into some unspecified neighborhoods. Some of these complexes have some units available. Those were the pleaded facts in front of the district court. Didn't they allege that they represented voucher holders who were 80-plus percent black? They — as I read their complaint, they represent between one and one billion voucher holders. Yeah, that's exactly our problem with the complaint, Your Honor. They didn't give us any indication of this applicant pool. If it's one person — I think Judge Jones had it right. If you sort of flip the switch the other way and say, well, if you took away the policy, would it ameliorate the problem? On these allegations, we have no idea. They've not alleged that. They've not alleged any way that we meaningfully perpetuate segregation, even assuming that that is a viable claim, because we don't know. We don't know what complexes. We don't know anyone seeking to move in. This three-to-five number that's in the brief, there was no allegation that they had 126 families ready, willing, and able. So there's a real breakdown. And in our supplemental authorities letter, we cited some cases that indicate that in addition to alleging the disparity, you've got to tie it to the actual applicant flow at the complex for this very reason. I don't want to eat into my co-counsel's time. Are there other questions? We would ask that you affirm. Thank you. May it please the Court. My name is Valerie Williams. I represent defendant and appellee Brick Row, which is one of the property owners. Brick Row and the other appellees are all unified on the fronts that have to do with earlier, none of the property owners have ever accepted vouchers. Where Brick Row is separate from the herd in this particular case is that Brick Row took some of the same HUD and census data that ICP used in its complaint and showed how this data had been manipulated into flawed analysis, which destroyed its plausibility. As required under a Rule 12b6 motion, Brick Row accepted as true ICP statistics that were obtained from HUD and the U.S. Census Bureau. It accepted as true that there are approximately 30,000 voucher households in the Dallas metropolitan area and that 81% are African American and 10% are Caucasian. ICP combined hundreds of census tracts from several cities in the Dallas metropolitan area to formulate these statistics, which ICP then applied globally to all defendants regardless of where the defendants' properties were located. Well, maybe, I mean, isn't it, aren't you, I mean, I would assume that the voucher holder was willing to move somewhere where he didn't live. I mean, you think they had to move into an apartment house where they lived? That's a good question, Your Honor. A similar situation occurred in Haven Realty v. Coleman. This is a case that's cited by ICP on page 54 of its appellate brief. In Haven, plaintiffs sought to use statistics from the entire Richmond, Virginia metropolitan area against an apartment owner accused of discrimination against African Americans. The Supreme Court expressed strong skepticism of the validity of this statistical base. The court held it is indeed implausible to argue that defendants' discrimination could have palpable effects throughout the entire Richmond metropolitan area. Likewise, the municipalities in the Dallas metropolitan area each have their own city councils, which govern building and zoning ordinances, impacting the location and construction of all types of housing. And this is the first red flag that a reasonable inference cannot be drawn between the statistical data pled by ICP and its disparate impact claim against Brick Row. Brick Row is only located in the city of Richardson. The combination of statistics from across multiple governing jurisdictions spread out over many miles should be the first indication that a plaintiff in an FHA disparate impact case does not meet the robust causation requirement as set forth by the Supreme Court. In the Heartland cases cited by ICP, the defendants were cities that exercised governance over zoning ordinance affecting property within their boundaries and control. The statistical evidence presented by plaintiffs in those cases directly correlated to those census tracts in the city where both the impacted property and the impacted population were located. In essence, a reasonably defined area for statistical comparison might be inferred by the court. By comparison, ICP used census and HUD data from multiple cities merely to demonstrate racial imbalance, but it sought to limit Brick Row to a single census tract out of nine census tracts comprising a single zip code in one city to support its disparate impact claim. This type of apples to oranges comparison in an overly broad multi-jurisdictional market area can never support robust causation at the pleading stage. If a municipality such as Plano, Texas cannot be liable for discriminatory zoning ordinances enacted by a neighboring municipality such as the city of Dallas, then a private property owner should not be held different to a different standard. ICP's cherry picking of statistics is evident when the HUD and census data is examined at the city or at the zip code level where the Brick Row complex is located. Aren't you going outside the complaint? For 12b6, we look at the complaint. We do, and what we did was we filed a judicial notice, which was not opposed by Brick Row, and we used the exact same census and HUD data that ICP used. And therefore, the court was entitled to examine that evidence in furtherance of its ruling. The data from the city or even the zip code level where the Brick Row complex is located shows that the number of available Section 8 housing units occupied by African Americans increased after the Brick Row complex was built in 2010. From 2009 to 2015, the number of Section 8 housing units in the city of Richardson increased by 34%. They're primarily occupied by African Americans. As this court held in Guidry v. Bank of LaPlace, conclusory allegations and unwarranted deductions of fact are not admitted as true. ICP's contrived statistical deduction masquerading as fact is nowhere near the robust causation demanded by the Supreme Court. We respectfully ask that this court affirm the district court's decision. Thank you. Okay, thank you. Mr. Daniel. Now, the applicant flow data in each of the Heartland cases comes from a wider area. In Huntington, it came from a wider metropolitan area. In other cases, it came from a wider area. In the St. Burns Parish case cited by them, it came from the New Orleans area. The applicant flow, in other words, the eligibility population, population selection, comes from a wider area. It doesn't come from a census area. I guess it was Judge Engelhardt's, well, maybe it was his point. The claim you are making would essentially require every landlord in a neighborhood that doesn't have X percent of minorities to engage in Section 8 voucher housing. Is that correct? That is incorrect. How can that be incorrect based on what you have alleged? Because, number one, a lot of those landlords may not have rents that are payable under the voucher program. Two, a lot of who? The landlord? Landlord's rents may not be low enough for the voucher program. If the voucher program can't pay the rent, the voucher program can't use the units. You can't rent a unit if you can't pay the rent, okay? Second, the individual voucher tenants who are coming up may not meet the landlord's other selection criteria. But you have arbitrarily alleged, without detail, that you have clients or whatever who can meet the landlord's selection criteria. Why are we supposed to accept that vague allegation for purposes of establishing a claim? Well, because we allege other facts in there, too. Well, you don't allege facts about these. In other words, if they have selection criteria that are published in some way, apart from voucher Section 8, you keep... That's where we took it from, was there are published selection criteria. We took, for example, the guarantor agreement. We took the paying the incentive payments for people that they didn't otherwise want to rent to. We took that. Suppose it was no children, no pets. Did you take that? No children and no pets are not part of our case. If it's no children and it's not a legitimate elderly project, that policy violates another part of the Fair Housing Act, which I don't think they would dispute. What about no pets? Your Honor, I don't think no pets, unless you can tell somebody... Well, but I'm saying... She can say somebody doesn't have a seeing eye dog and they need it. Well... That's a different part of the Fair Housing Act. There are criteria that a landlord might have, and you just allege in general terms we have clients who meet whatever criteria you want. Because ICP rents. One, ICP is a landlord, number one, as it's set out in the letter. Two, they help a lot of clients find places. They help clients who, one, have gone through the rigid Section 8 screening criteria, and that's not on the record, I know of. Do you represent white voucher holders? They're white voucher holders that get help. They're in the same application. I mean, you're still talking about, you know, on the one hand, you're just talking about minorities, but then in such a way that it appears that you're excluding other parts of your group that you're representing. Any time that there is a disproportionate impact case, what that means is there are also non-minority tenants, whatever, who are being affected by the policy and being hurt by the policy, too. The question is, is it more disproportionate minority that's in there? You don't have to show that it's all 100% minority for a disproportionate impact case. You don't have to show it for a disparate treatment case. And as this case is on the pleadings, it's on the pleadings, there's nothing in the In that regard, counsel, did you seek or do you even desire an attempt to amend to try to address? I mean, is that something that you think can be amended? Did you ask the district judge if you could have the opportunity as in the alternative? Well, we couldn't amend the disparate treatment case because he said it was a disparate impact case, our two disparate treatment cases. Well, any of the claims. He couldn't say there was nothing that was going to do any good to amend our two disparate treatment cases. It's futile. But at least he would say it was futile, I assume was his point. Did you ask in the alternative if you were not successful in defeating the motion to have the opportunity to amend? No, we don't think we needed to ask. OK, well, that's fine. I mean, that would be a, I think there's an entitlement to amend. It comes whether you ask for it or not under 1286 because it is a pleading issue. We're not. This is not summary judgment. This is not the end of a trial. OK, well, thank you very much. And I don't mean to be rude, but I did give you a bunch of extra time. Thank you. All right. Very interesting case. Final case of the.